IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-60228

---

MARINE SHALE PROCESSORS INC.,

                                        Petitioner,

versus

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                        Respondent.

---

Petition for Review of Order of
Environmental Protection Agency

---

April 18, 1996

Before REYNALDO G. GARZA, KING, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This case is an appeal of Marine Shale Processors, Inc. from final agency action of the Environmental Protection Agency. Specifically, MSP challenges EPA's decision to deny MSP's application for a Boiler and Industrial Furnace Permit required by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901-92K. This case is one of the trio described in United States v. Marine Shale Processors, Inc., No. 94-30664. We affirm.

I

In 1980, EPA promulgated regulations pursuant to RCRA governing the treatment, storage, and disposal of hazardous waste.

See, e.g., Final Rule, Hazardous Waste Management:  Overview and Definitions; Generator Regulations; Transporter Regulations, 45 Fed. Reg. 12,721 (1980); Final Rule, Interim Final Rule, and Request for Comments, Hazardous Waste Management System: Identification and Listing of Hazardous Waste, 45 Fed. Reg. 33,082 (1980).  These regulations defined two methods of processing waste, incineration and recycling.  The rules required facilities engaged in incineration to procure a permit called a Subpart O permit, a reference to 40 C.F.R. pt. 264 subpt. O.  See Proposed Rule and Request for Comment, Identification and Listing of Hazardous Waste; Amendments to Definition of Solid Wastes, 53 Fed. Reg. 519, 522 (1988).  Facilities engaged in recycling could operate without permits.  See 45 Fed. Reg. at 33,120 (promulgating 40 C.F.R. § 261.6); see also Final Rule, Hazardous Waste Management System; Definition of Solid Waste, 50 Fed. Reg. 614, 626-27 (1985).

In 1985, EPA defined a new category of hazardous waste processing devices called "industrial furnaces," a term defined to include "aggregate kilns" having certain characteristics.  50 Fed. Reg. at 661.  Industrial furnaces could engage in either incineration or burning for energy recovery.  If the industrial furnace facility engaged in incineration, then it needed a Subpart O permit.  If the industrial furnace engaged in recycling, no permit was necessary.  50 Fed. Reg. at 626-27.  MSP began operations in 1985, claiming an exemption from the Subpart O permit requirement on the grounds that its kiln was an aggregate kiln and that its facility was an industrial furnace engaged in recycling.

2

On August 14, 1990, the United States sued MSP in United States District Court for the Eastern District of Louisiana in the action giving rise to Nos. 94-30419 and 94-30664, claiming among other things that MSP had incinerated hazardous waste without a Subpart O permit since it opened for business in 1985. In 1991, EPA promulgated new rules requiring that all devices using thermal combustion to treat hazardous wastes have either a Subpart O permit or a new form of permit for recycling facilities called a Boiler and Industrial Furnace permit. Final Rule, <u>Burning of Hazardous Wastes in Boilers and Industrial Furnaces</u>, 56 Fed. Reg. 7134, 7138 (1991). These regulations ended the exception from the permit requirement for facilities engaged in recycling. MSP submitted a BIF permit application and a Certification of Compliance with BIF regulations. On the basis of these filings and its contention that it fit within the previously existing recycling exemption, MSP claimed interim status to operate while EPA considered the permit application. EPA's internal consideration of MSP's application for a BIF permit proceeded simultaneously with litigation of the United States' action in Louisiana District Court.

On January 31, 1994, EPA issued a tentative decision denying MSP's BIF permit application. EPA rested its tentative denial decision upon its conclusion that MSP did not produce aggregate and that its system did not use thermal treatment to accomplish recovery of materials or energy within the meaning of 40 C.F.R. § 260.10. EPA opened its decision for public comment.

A jury trial on the United States' claim in district court that MSP had incinerated waste without a permit began in April, 1994. At the end of a five-week trial, the court submitted 13 interrogatories to the jury. In late May, the jury found itself able to agree to the answer to only nine of the questions. The questions relevant to this appeal, together with the jury's answer if any, were as follows:

> 1. Was MSP entitled to a recycler exemption from the requirement of a permit as an operator of an incinerator of hazardous waste? (unable to answer)

> 2. Were all of the hazardous wastes accepted by MSP beneficially used or reused or legitimately recycled? (unable to answer)

> 2(a). Were all of the hazardous wastes accepted by MSP prior to August 21, 1991, beneficially used or reused or legitimately recycled? (unable to answer)

> 10. Is MSP's rotary kiln an aggregate kiln? (yes)

> 13. Are the rotary kiln, oxidizers Nos. 1 and 2, and slag box part of a kiln system that produces aggregate? (yes)

Because the jury failed to answer four of the interrogatories, the district court declared a mistrial.

In September, 1994, EPA issued a final decision denying MSP's application for a BIF permit. EPA rested upon its finding that MSP's rotary kiln system did "not meet the definition of aggregate kiln and, therefore, does not meet the definition of industrial furnace." EPA also cited MSP's poor history of compliance with the environmental laws, as well as its finding that MSP could not qualify as an aggregate kiln because it destroyed hazardous waste. MSP appealed to the Environmental Appeals Board, relying on

4

principles of Article III, the seventh amendment, collateral estoppel, due process, and the Administrative Procedures Act, 5 U.S.C. §§ 701-06.

In March, 1995, after a review of the record, the EAB affirmed EPA's denial.  In re Marine Shale Processors, Inc., Dkt. No. 06900009, RCRA Appeal No. 94-12, 1995 WL 135572 (EPA 1995).  The EAB stated that MSP did not produce "commercial-grade aggregate" from its system and thus that its facility could not qualify as an aggregate kiln.  The EAB questioned EPA's reliance on MSP's compliance history and on MSP's destruction of hazardous waste, but ultimately affirmed the decision in its entirety.  In April, 1995, EPA finally denied MSP's BIF permit application on all grounds stated in its September, 1994 ruling.  MSP appeals the denial of its permit, invoking our authority under 5 U.S.C. § 706(2) to set aside final agency action.  We affirm.


II

MSP invokes Article III, the Seventh Amendment, and collateral estoppel principles to attack EPA's permit denial.

A

MSP begins its assault upon the permit denial with constitutional arguments based on Article III and the Seventh Amendment.  Its first argument is that Article III and the Seventh Amendment prevent EPA from ruling on its permit application.  Its second argument is that the United States, by filing its lawsuit and thus invoking the judicial power of an Article III court, could

5

not continue to consider in an internal administrative proceeding issues identical to those being litigated in the Article III court. With cites to Montesquieu and Madison, MSP argues that the moment the United States filed suit the district court obtained exclusive power to decide any issue before it and that EPA's permitting staff could not resolve any legal question pending before the district court without running afoul of the constitutional prohibition forbidding Executive Branch review of Article III court decisions. In a similar vein, MSP invokes the Seventh Amendment, contending that once the Seventh Amendment is activated as to an issue, a party is entitled to have the issue resolved by a jury.

With regard to both MSP's Seventh Amendment and Article III arguments, we begin with the proposition that, in the absence of a simultaneous district court proceeding, Congress violated neither constitutional principle by providing that EPA should adjudicate MSP's permit application. See In re Texas General Petroleum Corp., 52 F.3d 1330, 1336 (5th Cir. 1995) ("Whether an Article III court is necessary involves the same inquiry as whether a litigant has a Seventh Amendment right to a jury trial.") (citing Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 53-54 (1989)). MSP's contention to the contrary comes decades, perhaps centuries, too late. Congress's choice to grant EPA authority over the permit proceeding represents a classic constitutional example of the public rights doctrine.

Viewing our inquiry as governed by "practical attention to substance rather than doctrinaire reliance on formal categories,"

6

Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 587 (1985), we note the following characteristics of the permit proceeding. First, it is a dispute to which the sovereign is a party. See Crowell v. Benson, 285 U.S. 22, 50 (1932); Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284 (1855). Second, the permit requirement "serves a public purpose as an integral part of a program safeguarding the public health." Thomas, 473 U.S. at 589. Third, the scientific and technical nature of the decisions in this permit proceeding make the decision "peculiarly suited to examination and determination by an administrative agency specially assigned to that task." Crowell, 285 U.S. at 46. Fourth, the permit proceeding, and indeed most of RCRA itself, deals with a narrowly cabined area of the law. See Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 852 (1986) (referring to a "particularized area of law") (internal quotation marks omitted). Fifth, the permit application implicates a federal right not immediately analogous to the state common law causes of action "assumed to be at the 'core' of matters normally reserved to Article III courts." 478 U.S. at 853. Sixth, EPA, "unlike the bankruptcy courts under the 1978 Act, does not exercise 'all ordinary powers of district courts,' and thus may not, for instance, preside over jury trials or issue writs of habeas corpus." 478 U.S. at 853 (quoting Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 85 (1982) (plurality opinion)). Seventh, Congress has provided for judicial review over the agency's permit denial under 5 U.S.C. §§ 704-06. See 478 U.S.

7

at 854-55. Under such circumstances, Congress violated neither the Seventh Amendment nor Article III in delegating the permitting decision to EPA.

Having established that EPA could constitutionally adjudicate the permitting proceeding in the absence of a suit by the United States, we address MSP's argument that the enforcement action altered the constitutional landscape. We find MSP's contention convincing in neither the Article III nor the Seventh Amendment context. At bottom, both arguments fail for the same reason: This is not a case in which EPA has sought to review or alter the decision in the district court, to reverse the district court's findings, or to interfere with the judiciary's ability to issue a binding decision. Cf. Hayburn's Case, 2 U.S. (2 Dall.) 40 (1792) (suggesting that the judiciary could not render an opinion as to whether a citizen was entitled to a pension when both the Secretary of War and the Congress retained power to decide whether to honor the judiciary's judgment); Town of Deerfield v. FCC, 992 F.2d 420 (2d Cir. 1993) (rejecting the FCC's attempt to alter or amend a federal court judgment). EPA has, to be sure, disagreed with several of the conclusions of the district court, but it has never sought to interfere with the effect that these conclusions have upon the causes of action being adjudicated there. The permit application and the district court litigation involve common issues, but the two proceedings are deciding different questions, the most important of which is that the permit proceeding concerns whether MSP may operate legally in the future, while the district

8

court proceeding concerns whether MSP has operated legally in the past.

Should EPA attempt to use the rulings in the permit proceeding to collaterally estop MSP in the district court action, MSP's argument may have force; we make no comment on this question. Cf. Parklane Hosiery Co v. Shore, 439 U.S. 322 (1979) (holding that the Seventh Amendment does not prevent an equity court's determination of legal issues from estopping relitigation of the same issues in a subsequent action at law). But given that EPA could constitutionally adjudicate the permit application in the absence of the district court litigation, MSP can make no argument until the permitting proceeding has some effect upon the issues being decided in the district court litigation. When and if MSP feels that effect, it may litigate these issues.

Accordingly, EPA has never sought to judge its own case any more than it does in any normal permit application proceeding. If the permitting arm of the agency could constitutionally exercise jurisdiction over MSP's permit application in the absence of a district court proceeding, as we have held, then nothing in Article III prevented EPA's permit staff and the district court from proceeding simultaneously. Having established this general principle, we examine MSP's arguments in detail.

1

MSP argues that as a result of EPA's suit, Article III gave the district court exclusive power to decide the controversy between MSP and EPA. MSP points to no statute or constitutional

9

provision granting exclusive jurisdiction to the federal district courts to decide all disputes between EPA and entities like MSP. Its argument assumes that there would be no Article III bar had EPA denied the permit and then filed the district court suit, or if EPA had litigated the suit to completion and then denied the permit.

We find MSP's Article III arguments unconvincing. State courts are not Article III courts, yet nothing in Article III prevents a state court from litigating the same controversy pending before a district court. Kline v. Burke Construction Co., 260 U.S. 226, 230 (1922). In such cases, if the state court reaches final judgment first, its disposition may preclude further litigation in the district court without violating Article III. Id. at 233-34; Wayside Transportation Co. v. Marcell's Motor Express, Inc., 284 F.2d 868, 870-71 (1st Cir. 1960). MSP cites to no case suggesting that this principle would change if the state itself were a party to both the state court and federal court litigation. Like the Sixth Circuit,

> We see no reason why the rule permitting a second tribunal to proceed to the decision of an in personam matter within its jurisdiction, in spite of the fact that another action between the same parties is pending in another tribunal, should not be applicable as between a United States District Court and a federal administrative agency in which Congress expressly has placed responsibility for regulation in a specific area.

Ashland Oil & Refining Co. v. FPC, 421 F.2d 17, 21 (6th Cir. 1970).

MSP cites California v. FPC, 369 U.S. 482 (1962), for the broad proposition that any time a federal court has jurisdiction over a controversy in which an agency is a party, the agency must withhold administrative action until the court has reached a

10

decision. We do not read California so broadly. In that case, the Supreme Court held that the FPC should not have approved a merger while a suit challenging the merger, filed by the United States, was pending in federal district court. Justice Brennan's majority opinion does not mention Article III. Instead, it justifies its holdings with "practical reasons," primarily the difficulty of unscrambling an already consummated merger.

MSP points out no analogous practical considerations in this case. To the contrary, EPA could reasonably decide that the district court litigation promised to continue for years. The EAB, for instance, considered MSP official George Eldredge's statement that "whatever action EPA proposes, and whatever the outcome of the lawsuit, the case is going to drag on for years. In the mean[ ]time, we'll be doing business as usual." In re Marine Shale Processors, Inc., Dkt. No. 0690009, RCRA Appeal No. 94-12, 1995 WL 135572, at * 17 (EPA 1994) (internal quotation marks omitted). EPA could conclude that awaiting the decision of the judiciary on those issues common to the district court litigation and the permit proceeding would unduly delay resolution of the important questions in the latter and would allow an admitted violator of the environmental laws to continue operating, perhaps in further violation of these laws, until the conclusion of the litigation and the inevitable appeal. Normally, speedy adjudication from an administrative agency is something to be encouraged, and we cannot fault EPA's decision not to await the unavoidably ponderous progress of the district court litigation.

11

For similar reasons, we reject MSP's seventh amendment argument. As EPA acknowledges, MSP has a right to a jury trial in the district court proceeding. See Tull v. United States, 481 U.S. 412 (1987). But because the permit application triggered a public rights dispute, MSP has no right to a jury trial in this proceeding. Atlas Roofing Co. v. OSHRC, 430 U.S. 442, 455 (1977); see also id. at 450 (noting that jury trials may be incompatible with agency processes). MSP cites no case holding that the pendency of an action in one tribunal in which a jury trial right attaches prevents another tribunal from proceeding without a jury. Unless and until MSP is prevented from litigating its defenses in the district court to a jury, no arguable jury trial violation has occurred.

Nothing in Beacon Theaters, Inc. v. Westover, 359 U.S. 500 (1959), requires a different result. In Beacon Theaters, the plaintiff filed an action seeking an injunction prohibiting the defendant from prosecuting an antitrust suit. The defendant counterclaimed in a complaint stating the antitrust cause of action and demanded a jury trial. The trial judge scheduled the hearing on the plaintiff's request for injunctive relief ahead of the jury trial on the defendant's antitrust claim. The Supreme Court held that the trial court abused its discretion in scheduling the equity suit first because such scheduling would have the effect of depriving the defendant of its right to a jury trial in the counterclaim. Crucial to this holding was the fact that modern

rules of civil procedure allowed joinder and joint resolution of multiple claims of multiple parties, thus in effect giving the plaintiff an adequate remedy at law by joining all involved.  See id. at 507, 509, 511; see also Dairy Queen, Inc. v. Wood, 369 U.S. 469, 472-73 (1962) (interpreting Beacon Theaters in this manner); Lytle v. Household Manufacturing, Inc., 494 U.S. 545, 550-52 (1990) (discussing the importance of the fact that legal and equitable claims were tried in the same lawsuit in applying the Beacon Theaters rule).  In this case, in contrast, the district court may not grant a permit, and the adjudicatory arm of EPA may not grant the relief sought in EPA's district court complaint.  A single proceeding could not resolve both issues.

B

MSP next argues that EPA's permit denial violated the principle of collateral estoppel.  In order to invoke collateral estoppel, however, "the issue under consideration [must be] identical to that litigated in the prior action."  Copeland v. Merrill Lynch & Co., 47 F.3d 1415, 1422 (5th Cir. 1995).  MSP's collateral estoppel argument fails because the jury was either not asked to resolve or unable to resolve questions crucial to EPA's decision to deny MSP's permit application.

MSP based its BIF permit application to EPA upon the contention that its kiln system constituted an industrial furnace. 40 C.F.R. § 260.10 defines industrial furnace as "any of the following enclosed devices that are integral components of manufacturing processes and that use thermal treatment to

13

accomplish recovery of materials or energy." The definition then lists a series of twelve devices by name, which Judge Duplantier referred to as the "twelve apostles." "Aggregate kilns" are one of the twelve apostles. As applied to this case, then, section 260.10 requires EPA to grant MSP a permit if Marine Shale's kiln is (1) an aggregate kiln, (2) that is an integral component of a manufacturing process, and (3) that uses thermal treatment to accomplish recovery of materials or energy.

In addition, paragraph thirteen of the definition provides that EPA may add other devices to the list of the twelve apostles after consideration of five enumerated factors with a sixth catchall statement that EPA might consider "other factors, as appropriate." The first of these five factors is "the design and use of the device primarily to accomplish recovery of material products." The remaining four generally focus on the inquiry of whether a facility makes a product.

In an interpretive step that MSP has not challenged, EPA analyzed MSP's permit application in terms of the five factors articulated in paragraph thirteen and did not directly focus on the narrative criteria preceding the list of the twelve apostles. We note that the first of the five factors mimics the second of the narrative criteria and that both focus on whether a facility recovers energy or materials.

EPA denied MSP's permit application on the basis of its finding that MSP's kiln system met none of the five factors

14

enumerated in paragraph thirteen.[1] In particular, EPA discussed extensively its grounds for finding that the majority of the hazardous waste processed by MSP contributed nothing to the production of a product and were not recovered or recycled, and therefore that MSP did not use thermal treatment to recover energy or materials. In addition, EPA found that MSP's kiln did not produce aggregate after defining aggregate according to commercial specifications.

The jury's findings covered only a portion of the industrial furnace inquiry considered in terms of either the narrative criteria and the twelve apostles or the five factors in paragraph thirteen. The jury found that MSP's rotary kiln was an aggregate kiln, and that MSP's kiln, oxidizers, and slag box were part of a system that produced aggregate. For whatever reason, the jury was not asked whether MSP uses thermal treatment to recover energy or materials. The interrogatories most analogous to the thermal treatment inquiry were questions 2 and 2(a), which asked the jury whether the hazardous wastes received by MSP were beneficially used or reused or legitimately recycled. The jury failed to reach a

---

[1] Although the EAB affirmed Region VI's initial decision to deny the permit primarily upon the ground that MSP's kiln was not an aggregate kiln, it "recognize[d] that the Region based its decision on other grounds as well" and clarified that "to the extent we have not ruled on those other grounds, nothing in this decision should be construed as preventing the Region from basing its final permit decision on these other grounds." 1995 WL 135572, at * 24. The final agency action of which MSP complains is Region VI's formal denial of its permit application. This denial makes clear that one of the bases of Region VI's denial was MSP's failure to meet the criteria stated above. MSP has not argued to this court that our review is limited to the grounds articulated in the EAB's decision.

verdict on these interrogatories. Accordingly, EPA decided issues that the jury did not, and collateral estoppel does not apply.

MSP seeks to avoid the force of this argument by contending that the jury decided whether MSP used thermal processes to recover energy or materials when it decided that MSP produced aggregate. This argument is structurally identical to SWP's contention, which we rejected in United States v. Marine Shale Processors, Inc., No. 94-30419, at 11, that producing a product is necessarily recycling, and we disagree for the same reason here. A reasonable trier of fact could find that, to the extent that MSP produced aggregate, it did so without recovering the energy or materials in the hazardous wastes that it accepted.

MSP's brief suffers from the assumption that the only issue in the permit application proceeding was whether its rotary kiln constituted an aggregate kiln. That assumption is incorrect. Not all aggregate kilns are industrial furnaces, as the narrative criteria of the definition of industrial furnace and the first of the five factors in paragraph thirteen make clear.[2]

---

[2] We also reject MSP's implication that the district court's ruling that MSP had interim status as a BIF estoped EPA from denying the permit. Interim status is designed to last only until EPA rules on a permit application.

Because of our disposition of MSP's collateral estoppel argument on the grounds of lack of identity of the legal issues involved, we do not reach EPA's argument that the jury's findings cannot support collateral estoppel because they have not been incorporated into a final judgment. We note, however, the tension between the dictum in Recoveredge L.P. v. Pentecost, 44 F.3d 1284, 1295 (5th Cir. 1995), which suggests that jury findings are sufficient to support collateral estoppel even if the verdict has not yet resulted in a final judgment, and the holding of Avondale Shipyards, Inc. v. Insured Lloyd's, 786 F.2d 1265, 1272 (5th Cir. 1986), which suggests that partial summary judgments are

16

MSP argues that EPA's findings of fact and conclusions of law were arbitrary and capricious. We do not agree.

We limit our review in this case to sections III.A and III.B of EPA's September 15, 1994 Statement of Basis for Denial of Permit Application by Marine Shale Processors, Inc. The findings of fact and conclusions of law included in these two sections are sufficient to uphold EPA's decision. Although we find none of EPA's findings of fact or conclusions of law in these two sections arbitrary, capricious, or contrary to law, we focus our discussion here on the evidence underpinning the finding that MSP's system does not use thermal processes to accomplish recovery of energy or materials and on certain determinations EPA made in deciding that MSP's material does not qualify as aggregate within the meaning of 40 C.F.R. § 260.10.

A

EPA's finding that MSP has not designed or used its facility to accomplish recovery of material products and thus that MSP does

---

insufficient. Under Fed. R. Civ. P. 54(b), both jury findings and partial summary judgments are subject to revision before entry of final judgment. Even when, as here, a trial judge has rejected a motion for a judgment as a matter of law seeking to upset the jury's findings, Rule 54(b) provides that this rejection is itself subject to revision at any time before final judgment. We thus have some difficulty justifying a rule, if in fact it exists in this circuit, allowing issue preclusion to attach to jury verdicts but not to summary judgments, when neither has been incorporated into a final judgment. We do not seek to resolve this tension in this case.

Given our disposition of this case, we also do not reach EPA's argument that the different burdens of proof and nature of the proceedings precludes invocation of collateral estoppel.

not use thermal treatment to accomplish recovery of materials or energy is not arbitrary or capricious. As our discussion will make clear, EPA's decisions are highly technical and scientific and are not readily susceptible to lay review. Most of these decisions are factual. We bear these considerations firmly in mind when considering MSP's request that we upset EPA's conclusions in an area in which Congress has chosen to trust the experts.

Throughout this section, we assume that MSP produces something its calls aggregate and that its kiln system is an integral component of the process for this aggregate's production. We focus entirely on the question of whether EPA could conclude that MSP does not use thermal treatment to accomplish recovery of materials or energy, or that the design and use of MSP's device is not primarily to accomplish recovery of material products.

1

EPA considered evidence that MSP processed quantities of "lab packs" containing wastes that could contribute nothing to the production of a product. The lab packs were packages of kitty litter and other absorbent material surrounding glass or plastic containers of toxic chemicals. For example, Dr. Douglas Kendall, an EPA chemist, used MSP's manifests and Material Characterization Data Sheets to determine that MSP processed sulfur, toluene solution, ammonium hydroxide, hydrochloric acid solutions and mixtures, nitric acid, and sulfuric acid. Dr. Kendall confirmed that these wastes do not release significant energy when burned and, because they react to form gases at high temperatures, could

18

not provide bulk for MSP's product. EPA considered similar evidence regarding such materials as poisons, pesticides, other acids, and bases; specific substances included methylene chloride, trichlorotrifluoroethane, chloroform, perchloroethylene, trichloroethylene, nitric oxide, fluorotrichloromethane, pentachlorophenol, ethylenediamine, formaldehyde, carbon tetrachloride, and phosgene. MSP's experts could not specify how many of these substances contributed to a manufacturing process. MSP's handling of these substances also suggests that they contribute nothing to production. MSP employee Annika Keslick told EPA that MSP normally opened ten percent of these lab packs, and MSP's examination upon opening was limited to matching the name on the glass or plastic container within the pack to the information contained on the MCDS or manifest.

EPA could find that MSP was not accomplishing recovery of energy or materials from these wastes. The composition of the wastes themselves did not allow their combustion to contribute to any production process, and we cannot understand how MSP could have recovered energy or materials from these wastes without sampling them to verify their contents. MSP's only defense of its treatment of the lab pack wastes is that the kitty litter and other packaging provide mass for its aggregate. EPA could conclude that this argument misconstrues the regulations and is wrong as a matter of law. One does not recycle hazardous waste by placing that waste into a container and then recycling the container.

19

MSP correctly points out that the lab packs constitute only around one percent of the total volume of wastes processed at its facility. Nevertheless, the amount of material is significant in absolute terms in that MSP process an average to three to four hundred of the lab packs per week, and MSP's cavalier treatment of these "feedstocks" gives us pause when we consider the remainder of MSP's claim that all of its wastes contribute in some way to its process.

2

EPA considered evidence that MSP processed large quantities of waste with metal contaminants that contribute in no legitimate way to any manufacturing process and thus that MSP's use of these wastes did not constitute recovery of energy or materials. The metallic composition of these wastes spanned the periodic table and included highly variable quantities of lead, barium, cadmium, iron, silicon, aluminum, manganese, copper, zinc, bromine, strontium, calcium, and chromium. MSP's kiln did not destroy these metals. The residue from the process of metal-bearing waste, which MSP calls primary aggregate, normally required slagging to reduce leaching potential.

MSP suggests that it used these metals for two purposes. First, all provide mass for the ultimate product. Second, some compounds from these metals had other properties useful to the manufacturing process or the ultimate product. Dr. Paul Queneau, a metallurgical engineer, told EPA that iron oxide and alumina and titanium are "chain formers, and they very much enhance the

20

environmental stability of the slag." Other metallic oxides lower the melting point of the mixture and decrease its "melt viscosity."

EPA's disbelief of these justifications was not arbitrary or capricious. EPA scientists stated that the metal content of the waste necessitated slagging before the ultimate product could be legally placed on the ground and that the slagging process significantly reduced the mass produced. Dr. Terrance McNulty, an expert in extractive metallurgy, also provided evidence that many of these metals impeded production of the slag. Barium, for instance, which at times constituted fourteen to sixteen percent of the slag mass, impeded production because the high melting points of its compounds made liquification more difficult. Most importantly, EPA considered evidence suggesting that while many of the metal compounds do exhibit some of the desirable properties that Dr. Queneau identified, they do so only when present in certain concentrations. Chemist Stanley Wrobleski confirmed that Marine Shale made no attempt to control the metallic composition of its primary or slagged material and that metal concentrations varied widely. Moreover, EPA considered evidence such as a letter from Woodward-Clyde Consultants, MSP's primary environmental consultant, to George Eldredge, an MSP officer, stating that many of the metal compounds "are not introduced specifically or purposefully into the raw product in order to incorporate a particular physical characteristic into the produced aggregate but are inherent elements of the raw materials used in the manufacture

of the aggregate."[3]  Under such circumstances, EPA could conclude

that MSP's process did not recover of these metal-bearing wastes or

their metallic constituents.[4]

3

The largest percentage of MSP's wastes consists of soil

contaminated by organic compounds.  MSP contends that the soil

_____

[3]  Although this same letter concluded that "these elements are beneficial in enhancing the quality of the produced aggregate," it appears that this conclusion was based entirely upon the coincidence that "the majority of the elements of the produced aggregate are also the major constituents in some of the more common and select construction materials in use today."  Nothing in this letter sought to match the concentration of metals in MSP's material to that in the more common and select construction materials.  Marine Shale's argument would lead to the conclusion that any material containing sugar, butter, eggs, and flour is a cake.

[4]  EPA warned the regulated community about this type of "use" of metallic compounds shortly after filing the lawsuit in this case.

> The Agency notes in addition that it ordinarily does not consider metal-bearing hazardous wastes to be used as ingredients when they are placed in industrial furnaces purportedly to contribute to producing a product. . . . To be considered legitimate use as an ingredient, it would normally need to be demonstrated to EPA (or an authorized State) pursuant to § 261.2(f) that the hazardous metal constituents in the waste are necessary for the product (i.e. are contributing to product quality) and are not present in amounts in excess of those necessary to contribute to product quality.  This would normally require some demonstration that these hazardous metal constituents do not render the product unsafe for its intended use.  (The other sham recycling criteria discussed frequently by EPA would have also to be satisfied).  The types of uses of hazardous wastes in industrial furnaces to produce waste-derived products of which the Agency is aware, such as using hazardous wastes to produce aggregate or cement[,] . . . do not appear to satisfy these criteria."

Final Rule, <u>Burning of Hazardous Wastes in Boilers and Industrial Furnaces</u>, 56 Fed. Reg. 7133, 7185 (1991).

provides raw material, or mass, for its aggregate and that the organic compounds release heat when burned. Accordingly, MSP argues that both the soil and the waste contribute to its aggregate production process.

EPA's rejection of these arguments was not arbitrary or capricious. EPA considered evidence that some of these wastes consisted of soil contaminated with pentachlorophenol, which it specifically labeled a low energy hazardous waste constituent. In addition, EPA could conclude that MSP's process generates heat far in excess of that needed to make its product. Ronald Corwin, an EPA expert witness, suggested that the vast majority of the heat MSP produced from its burning travels in non-contact cooling water through MSP's facility and out into Bayou Boeuf. While MSP correctly points out that no recycling process is one hundred percent efficient, EPA's assessment of whether this heat is used or wasted is a particularly technical judgment about the overall efficiency of MSP's process. We will not disturb this judgment in this case.

4

At oral argument, MSP strenuously contended that EPA's permit denial decision rested on the conclusion that EPA could reject the application if MSP burned a thimbleful of hazardous waste for destruction, and thus that EPA had imposed an unreasonable burden in requiring a potential BIF to prove that it was recovering every atom or every bit of heat from waste in order to claim entitlement to a BIF permit. We make no comment on this argument; this is

23

simply not a thimbleful case. EPA has concluded that the overwhelming majority of MSP's wastes are burned for destruction, not used for recovery of energy or materials. The findings of fact and conclusions of law underlying these decisions are not arbitrary or capricious. EPA could conclude that to the extent that MSP produced a product, it did so in spite of the wastes it purported to recycle.

5

MSP's final attack on this analysis is that a focus upon recovery of energy or materials constitutes an analysis of the role that each material plays in the manufacturing process and of the purpose the particular facility serves. After the promulgation of the BIF regulations, MSP argues, a focus on purpose is improper. In particular, MSP quotes the EAB's statement that "we have serious doubts as to whether after promulgation of the BIF rule the purpose for which MSP is burning hazardous waste at the facility is relevant to the determinant of whether MSP's facility meets the industrial furnace definition." In re Marine Shale Processors, Inc., Dkt. No. 06900009, RCRA Appeal No. 94-12, 1995 WL 135572, at * 25 n.32 (EPA 1995). MSP also notes that 40 C.F.R. § 266.100 establishes that the BIF rules regulate BIFs without regard to whether the particular facility is burning for destruction or is recycling.

MSP's argument fails to separate two analytically distinct issues and regulations. 40 C.F.R. § 260.10 governs whether a facility definitionally qualifies as a BIF. Once a facility has

24

definitionally qualified as a BIF, 40 C.F.R. pt. 266 subpt. H governs most aspects of its operations, including burning for destruction. Although we note that some tension might arise if EPA were to interpret section 260.10's definition of BIF to exclude a facility that burns a thimbleful of waste for destruction, EPA has not done so here, as is made clear by EPA's focus on whether MSP uses its kiln system "primarily to accomplish recovery of material products." 40 C.F.R. § 260.10 (emphasis added). We cannot conceive of an interpretation of "to accomplish recovery of materials or energy" and other similar phrases in section 260.10 that does not focus on purpose.

An analysis of the preambles to the regulations defining BIFs supports our conclusion. In distinguishing between boilers and incinerators, EPA did seek to shift the initial focus of the definitional inquiry from primary purpose to structural design. Thus, EPA considered and eventually adopted a definition of boiler depending on whether the facility "achieve[s] heat transfer within the combustion chamber itself, generally by exposing the heat recovery surface to the flame." Proposed Rule, Hazardous Waste Management System: General, 48 Fed. Reg. 14,472, 14,483 (1983); see Final Rule, Hazardous Waste Management System; Definition of Solid Waste, 50 Fed. Reg. 614, 626-27 (1985).[5] But EPA recognized that some facilities normally engaging in recycling lacked this

---

[5] Even in the boiler context, EPA used the integral design test as a proxy for discovering the primary purpose of the facility. See, e.g., 50 Fed. Reg. at 626 ("The definition of boilers focuses on physical indicia of their legitimate use for energy recovery.").

25

distinguishing characteristic of boilers, and therefore chose to rely in part upon the primary purpose test in defining industrial furnaces. 50 Fed. Reg. at 626-27. Thus, the language of the rules and the preambles support our conclusion that EPA may interpret 40 C.F.R. § 260.10 to include a focus on the primary purpose of the facility or the role played by wastes processed within it.

B

We hold that EPA's refusal to label MSP's kiln an aggregate kiln was not arbitrary or capricious. MSP's primary attack upon this portion of EPA's reasoning is that EPA erred by narrowing its definition of "aggregate" to "commercial grade aggregate." In particular, MSP disputes EPA's reliance upon standards promulgated by the Louisiana Department of Transportation in reaching its decision that MSP's material does not constitute commercial grade aggregate. EPA's interpretations of its own regulations are entitled to substantial deference. Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566 (1980). We find no error.

In making its adjudicative decision, EPA had to employ some set of standards to distinguish aggregate from any material, like cigarette ash, capable of occupying space. The history of EPA's focus on recycling of hazardous wastes to produce a commercial product, as well as the use of commercial terms like "manufacturing" process and "industrial" furnace, suggests that EPA's decision to employ commercial criteria in its decision was reasonable at least.

26

EPA considered factual evidence from witnesses knowledgeable in the construction field that aggregate purchasers typically employ at least some specifications for the product they purchase. In addition, EPA heard evidence that a material must meet LaDOT specifications before the State of Louisiana will buy it for state construction projects and that many private commercial contractors adopt these specifications as well. In the face of this legal history, regulatory language, and factual evidence, we cannot fault EPA's choice to rely on common commercial specifications to define the term "aggregate kiln" in 40 C.F.R. § 261.10.

We also find nothing wrong with EPA's decision to consider LaDOT criteria as highly indicative, though not conclusive, of the content of common commercial specifications. MSP has proposed no alterative set of standards or definition. Federal courts give deference to an agency's interpretation of its own rules; under the circumstances of this case, however, we seriously doubt that such deference is necessary. We find no error in EPA's choice of legal standard.

Given EPA's legal interpretation of its own regulation, we find nothing arbitrary or capricious in its application of this interpretation to the facts at hand, and we refuse to upset its conclusion that MSP's material is not commercial grade aggregate. MSP concedes that its material, and substances made from it, could not comport with many of the LaDOT standards. In addition, MSP concedes that it conducts no tests at all on its material to determine strength, size, shape, specific gravity, absorbency,

27

durability, compaction, or texture. Although MSP presented expert studies suggesting that its slagged and primary material could be useful in the production of certain concrete and asphaltic products, other experts disagreed. The choice of which expert opinions to credit belongs to the EPA permitting staff. Like the Environmental Appeals Board, we are struck by the fact that MSP has never field tested any of the products that its experts testified might possibly be manufactured in part from its slagged and primary material and that none of MSP's product has ever been commercially used for these purposes. In re Marine Shall Processors, Inc., Dkt. No. 06900009, RCRA Appeal No. 94-12, 1995 WL 135572, at * 12 (EPA 1994). Under such circumstances, EPA's application of the law to the facts is not arbitrary or capricious.

IV

MSP continues its attack on the permit denial process by alleging that EPA's failure to insulate fully the personnel litigating the district court action from those participating in the permit denial process rendered the latter deficient under the Due Process Clause. MSP highlights the roles of two individuals, Dr. Allyn Davis and Ms. Terry Sykes.[6] We find no due process violation.

A

---

[6] MSP also devotes a footnote to an allegation of misconduct by Mr. Steven Silverman, an attorney in EPA's Office of General Counsel, labeling him the "finalizer" of EPA's permit denial decision. This portion of MSP's argument lacks merit.

Dr. Davis was the Director of EPA Region VI's Hazardous Waste Management Division, which has oversight of both enforcement and permitting issues within Region VI.  Dr. Davis referred MSP's facility to EPA's enforcement arm.  He later made the initial determination that MSP should not receive a BIF permit.  MSP also attacks Dr. Davis's adjudicative role on the grounds that his deposition testimony showed that he had prejudged certain key issues.

We find nothing remarkable in Dr. Davis's role in the permitting process.

> It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings.  This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.

Withrow v. Larkin, 421 U.S. 35, 56 (1975).  In his depositions, Dr. Davis repeatedly testified that he had not prejudged issues, that his decisions were based on information available at the time, and that he had decided to refuse MSP's permit application after an unbiased review of the evidence involved in the case.  The fact that Dr. Davis came to one conclusion based on some evidence did not at all prevent him from deciding the issue fairly when confronted with all the evidence.  See NLRB v. Donnelly Garment Co., 330 U.S. 219, 236-37 (1947) (holding that a hearing examiner's prior adverse ruling did not prevent him from adjudicating the same case on retrial even though the examiner's initial decision had been reversed for improper exclusion of evidence).

Ms. Sykes was one of the United States' attorneys in the enforcement action at pre-trial and early in the trial itself. After Dr. Davis and permit staff determined initially that EPA should deny MSP's permit application and identified the grounds for that determination, Ms. Sykes wrote a draft of the findings of fact and conclusions of law that served as the basis for EPA's statement justifying the permit denial. Permit staff official Elaine Taylor provided evidence that Ms. Sykes became involved only after the permitting branch had completed an exhaustive review of MSP's six volume application, after Dr. Davis had approved the staff recommendation to deny the permit, after the staff had identified the grounds for the refusal, and several months after Ms. Sykes resigned from the district court litigation team. EPA relied on Ms. Sykes because of the illness of another attorney.

Ms. Sykes' role in the process was less than ideal, and the EAB correctly labeled it a mistake in judgment. In re Marine Shale Processors, Inc., Dkt. No. 06900009, RCRA Appeal No. 94-12, 1995 WL 135572, at * 23 (EPA 1994). The question, however, is whether Ms. Sykes' role denied MSP due process. We think not.

Ms. Sykes "is entitled to the normal presumption of good faith that, in courts of law, government officials still enjoy, that must be refuted by well-nigh irrefragable proof." Starr v. FAA, 589 F.2d 307, 315 (7th Cir. 1979); see Schweiker v. McClure, 456 U.S. 188, 195-96 (1982). MSP's burden is to persuade us that the use of Ms. Sykes posed "such a risk of actual bias or prejudgment that the

practice must be forbidden if the guarantee of due process is to be adequately implemented." <u>Withrow</u>, 421 U.S. at 47. In this case, Ms. Sykes' made no decision at all. She had no power to decide whether to grant MSP its permit, nor did she have power over those making that decision. Her role consisted entirely of articulating the thoughts and decisions of others. Even if Sykes' mind were "irrevocably closed," <u>FTC v. Cement Institute</u>, 333 U.S. 683, 701 (1948), she had a small role in the decision making process.

MSP analogizes Sykes' role to that of a federal court law clerk and argues that our decision in <u>Hall v. SBA</u>, 695 F.2d 175 (5th Cir. 1983), mandates reversal here. In <u>Hall</u>, we remanded a judgment for a new trial because a magistrate judge used a law clerk who from previous experience possessed intimate knowledge of the facts of the case and who had previously written a letter to the defendants stating that she agreed with the plaintiff. <u>Hall</u> does not control our decision in this case for two reasons. First, <u>Hall</u> was a decision under 28 U.S.C. § 455, which governs judicial conduct. "As this and several other circuits have recognized, section 455 establishes a statutory disqualification standard more demanding than that required by the Due Process Clause." <u>United States v. Couch</u>, 896 F.2d 78, 81 (5th Cir. 1990); <u>see also</u> <u>Dirt, Inc. v. Mobile County Commission</u>, 739 F.2d 1562, 1566 (11th Cir. 1984) ("Although such an appearance of bias is clearly present in this case, the standards governing administrative proceedings are far more relaxed than those controlling judicial hearings."). Second, the <u>Hall</u> law clerk was involved throughout the entirety of

31

the trial; she wrote bench memoranda, administered the case until the end of litigation, and had daily informal access to the magistrate. The danger existed that her bias affected the decision itself. In this case, the record shows that EPA used Sykes only after unbiased staff had reached the tentative decision to deny MSP's permit and had identified the grounds for the denial, and that Sykes had no role in the process beyond providing a draft of the eventual findings of fact and conclusions of law.

By comparison, we note that district courts occasionally adopt wholesale the findings of fact and conclusions of law written by a victorious litigant. While we discourage this practice, we have never radically altered the standard of review in such cases, much less concluded that such an adoption results in a per se due process violation. See Lewis v. NLRB, 750 F.2d 1266, 1272 n.5 (5th Cir. 1985); James v. Stockham Valves & Fittings Co., 559 F.2d 310, 314 n.1 (5th Cir. 1977) cert. denied, 434 U.S. 1034 (1978). We tolerate the occasional use of this device because of our trust that district courts will closely examine the proposed findings and will carefully consider the objections and arguments of the opposing party. In this case, EPA formalized exactly this sort of review process. After Sykes wrote the proposed findings, EPA gave MSP an opportunity to criticize her work. MSP took full advantage of this opportunity by filing 18 boxes of argument. EPA's permitting staff then reexamined the findings and adhered.

These facts distinguish this case from Bethlehem Steel Corp. v. EPA, 638 F.2d 994, 1009 (7th Cir. 1980), upon which MSP

principally relies. MSP does not allege that EPA failed to disclose the grounds for its decision, that prosecutorial staff sought to delay the timing of an adjudication in order to gain a tactical advantage, or that adjudicatory staff sought to force MSP to waive certain litigation defenses in return for favorable treatment on its permit application. It was the combination of all of these factors, together with the improper mixing of adjudicatory and prosecutorial staff, that concerned the Seventh Circuit in Bethlehem Steel.

We question whether the use of Sykes as a federal law clerk would have passed the muster under section 455, given our statement in Hall that "[e]very judge has suffered a change of heart after reaching a tentative decision. Much might happen during the research and writing to affect the decision. Until the decision was signed and rendered, it was in pectore judicis, subject to possible influence." 685 F.2d at 179. Nevertheless, the constitutional standard for agency adjudication is not as stringent, and we hold that EPA provided MSP due process of law in its review of the permit application.

IV

MSP makes one final argument. It contends that EPA exceeded its statutory authority by basing the permit denial in part on MSP's poor history of compliance with environmental laws. We refuse to reach this argument. We have upheld EPA's denial of MSP's permit on other grounds, and MSP does not argue that the

33

inclusion of this alternative grounds for decision renders the permit denial infirm.

AFFIRMED.