**SIEMENS MEDICAL SYSTEMS, INC., Plaintiff,**

v.

**NUCLEAR CARDIOLOGY SYSTEMS, INC., doing business as N C Systems, Inc., Defendant.**

Civil Action No. 94–B–2534.

United States District Court, D. Colorado.

Oct. 3, 1996.

 against which to compare an allegedly fraudulent price.

Michael J. Dommermuth, McGloin, Davenport, Severson and Snow, P.C., Denver, CO, for Plaintiff.

Joel C. Maguire, Martin & Mehaffy, Boulder, CO, for Defendant.

## MEMORANDUM OPINION & ORDER

BABCOCK, District Judge.

In this diversity action, plaintiff, Siemens Medical Systems, Inc. (Siemens), moves for summary judgment on its claim that defendant, N C Systems, Inc. (NCS), breached a contract between the two parties. Further, Siemens moves for summary judgment on NCS's counterclaims for breach of contract and intentional interference with contractual relations. The motion is adequately briefed and oral arguments would not materially aid its resolution. After consideration of the motion and the briefs, I conclude that Siemens' motion for summary judgment should be granted in part and denied in part.

### I.

The following facts are undisputed, unless otherwise noted. Siemens is a Delaware corporation with its principal place of business in New Jersey. Siemens manufactures and sells medical equipment and related products and services. NCS is a Colorado corporation with its principal place of business in Colorado. NCS provides turnkey facilities for nuclear cardiology, including consultation, license and training applications, hardware, software and service. (PTO Stip. ¶¶ 1–3.)

In January 1992, Siemens and NCS entered into a contract (the January Agreement) under which NCS agreed to purchase from Siemens six new nuclear gamma cameras of the sort used in detecting cardiovascular diseases for a price of $162,371.00 each.

(PTO Stip. ¶ 4; Pltf.Ex. 2.) In August or September of 1992, Siemens contacted NCS regarding an opportunity to purchase two nuclear cameras for a discounted price of $145,000.00 each. (Pltf.Br. ¶ 5; Def.Br. p. 2.) NCS alleges that Siemens promised orally that the two discounted systems were "new systems being returned to Siemens." NCS states that it understood the systems to be "demos" or "loaners" that Siemens had never sold and were not used otherwise. (Def.Br. p. 2; Def.Ex. 2(39–40).) Siemens claims NCS understood that the discounted systems were used. (Pltf.Br. ¶ 5; Pltf.Ex. 5(90–94).) Both parties agree that the discounted systems were to be counted against the parties' obligations under the January Agreement. (Pltf.Bf. ¶ 6; Def.Br. p. 2.)

NCS then entered into a contract with Cardiovascular Associates (CVA) to sell CVA a "mobile unit" that would incorporate in it a new Siemens nuclear gamma camera. (Pltf.Ex. 8.) NCS designated the CVA mobile unit as the destination for one of the previously installed Siemens systems. (PTO Stip. ¶¶ 5–8.) Siemens shipped a used camera to Colorado, the fabrication site for the mobile unit. (PTO Stip. ¶ 9.) After approximately one month, NCS shipped the completed mobile unit, including the used camera, to CVA in Tennessee. (PTO Stip. ¶ 10.)

CVA rejected the mobile unit upon discovery that the camera was not new. (PTO Stip. ¶ 12.) NCS contends that CVA rejected the mobile unit because of false statements made by Siemens about the condition and capabilities of the camera. (C.C. ¶¶ 15–17.) CVA subsequently contracted directly with Siemens for a new camera. (Def.Ex. 51.) In addition, CVA sued NCS in United States District Court, Eastern District of Tennessee for damages arising from NCS's alleged breach of contract. That court granted CVA partial summary judgment on its claim for breach of contract against NCS. Subsequently, NCS and CVA settled the case, and it was dismissed with prejudice.

Siemens filed this action on November 7, 1994. In its only outstanding claim for relief, Siemens alleges that NCS breached its contract with Siemens by refusing to pay for the nuclear camera system, including the camera

and related equipment. (Compl. ¶¶ 8, 18–21.) NCS counterclaims for breach of contract and for intentional interference with its contractual relations with CVA. Siemens moves for summary judgment on its claim for breach of contract and on both of NCS's counterclaims. NCS argues that genuine issues of material fact exist whether Siemens was bound contractually to deliver a new camera to NCS and whether Siemens intentionally interfered with NCS's contractual relations with CVA. I agree with NCS in part, and I will deny Siemens' motion as to its breach of contract claim and NCS's counterclaim. However, the doctrine of issue preclusion bars NCS's counterclaim for intentional interference with contractual relations.

## II.

### *SUMMARY JUDGMENT STANDARD*

■ The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. When the moving party is the plaintiff, the operative inquiry is whether, based on all documents submitted, reasonable jurors must find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12; *Mares*, 971 F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White*, 45 F.3d at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10.

### *CHOICE OF LAW*

■ In a diversity action, district courts use the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Looking first to the law of this forum state, Colorado has adopted Colo.Rev.Stat. § 4–1–105 (1992), which is the choice of law provision for the Uniform Commercial Code. Further, Colorado courts apply the Restatement (Second) of Conflict of Laws (1971) for tort actions. *First Nat'l Bank v. Rostek*, 182 Colo. 437, 448, 514 P.2d 314, 320 (1973).

Section 105(1) states:

Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights

and duties. Failing such agreement, this title applies to transactions bearing an appropriate relation to this state.

Here, the January Agreement includes a choice of law provision, stating that the "rights and obligations of the parties under this agreement shall be governed by the law of the State of New Jersey." (Pltf.Ex. 2.) Moreover, because Siemens' principal place of business is in New Jersey, the transaction in question bears a "reasonable relation" to that state. Colo.Rev.Stat. § 4–1–105. Consequently, I conclude that the parties' choice of law controls, and New Jersey law governs the breach of contract claim by Siemens and the breach of contract counterclaim by NCS.

█ NCS's counterclaim for intentional interference with contractual relations, however, must be analyzed under the Restatement as a tort. Restatement § 145 addresses tort actions:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties....

(2) Contacts to be taken into account ... include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Here, the activities that relate to NCS's counterclaim of intentional interference with contractual relations occurred predominantly in Tennessee. Thus, I conclude that the law of Tennessee should govern NCS's counterclaim for tort damages.

█ In addition, Siemens contends that orders entered in the Tennessee litigation prior to dismissal should have preclusive effect on NCS's counterclaim for intentional interference with contractual relations. The Tenth Circuit has decided that, with limited exceptions, federal law should apply to questions of res judicata (claim preclusion) and collateral estoppel (issue preclusion) involving prior federal judgments. *Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1332 (10th Cir.1988) (adopting Restatement of Judgments (Second), § 87 (1982)); *Murdock v. Ute Indian Tribe of Uintah & Ouray Resv.,* 975 F.2d 683, 687 (10th Cir.1992), *cert. denied* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). The Tenth Circuit has held that unless the preclusion question involves some issue of state substantive law, such as privity between a present party and a party to the previous suit, federal law applies. *Id.* Here, the preclusion issues relating to the Tennessee litigation do not involve issues of state substantive law. Therefore, federal law applies.

### III.

█ The principal factual dispute regarding the parties' contract claims is whether NCS contracted to purchase a new or a used nuclear camera. Although ordinarily the construction of a written instrument is a matter for the court, "where its meaning is uncertain or ambiguous and depends upon parole evidence admitted in aid of interpretation, the meaning of the doubtful provisions is a question of fact." *Anthony L. Petters Diner v. Stellakis,* 202 N.J.Super. 11, 493 A.2d 1261, 1270 (App.Div.1985); *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 140 A.2d 199 (1958). NCS has presented sufficient evidence to raise a genuine question whether the contract called for a new or used camera. Therefore, for the purposes of this summary judgment ruling, I will assume that the contract called for a new camera.

Siemens contends, however, that it should prevail on its breach of contract claim because there is no genuine issue of fact precluding me from finding that NCS accepted the used camera system and that NCS failed to revoke its acceptance. I disagree.

█ The parties argue at length over whether NCS effectively accepted the equipment from Siemens. I need not decide this

question because even assuming NCS's acceptance, there remain genuine issues of material fact whether NCS repudiated that acceptance. A buyer who repudiates goods after acceptance has all of the same rights and duties with respect to the goods as a buyer who rejects goods. N.J.S.A. § 12A:2–608(3) (1962).

Assuming without deciding that NCS accepted the camera from Siemens, NCS can seek rescission of the contract if it properly repudiated its acceptance.

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:

. . . . .

(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

N.J.S.A. § 12A:2–608 (1962). Siemens concedes that the used status of the camera "substantially impairs" the value of the camera to NCS. The focus then is on whether (1) NCS accepted the camera "without discovery" that the camera was used, (2) NCS adequately "notified" Siemens within a "reasonable time" after NCS discovered or should have discovered that the camera was used, and (3) NCS allowed a "substantial change in the condition of the goods" that would bar revocation of acceptance. I will address these issues in order.

#### A.

On January 17, 1994, Siemens delivered a used nuclear gamma camera to the mobile unit fabrication site. Siemens installed the camera into the mobile unit. (PTO Stip. ¶ 9.) When delivered, the camera was dented and the paint was chipped such that it appeared

used. (Def.Ex. 6(6–8,10–13,30–33),7(14–18,-35–36,44).) NCS asserts that Siemens' employees then cleaned and repainted the camera. (*Id.*) NCS also contends that the only NCS employee to see the camera before it was repainted was Samuel P. Faivre, who was not in a position of responsibility and did not know that the camera was supposed to be new. (Def.Ex. 8(18–19,23–24).) Further, NCS contends that Faivre did not inform any other NCS employee about his observations of the condition of the camera. (Def.Ex. 8(23–24).) By the time Charles Rose, president of NCS, and other NCS employees inspected the camera, NCS states that it appeared new with the exception of minor dents and scratches that could have been storage-related. (Def.Ex. 2(95–98).)

Siemens argues that Faivre was "responsible for the construction of the mobile unit and the supervision of the installation of the camera" and that Rose and other NCS employees knew or should have known that the camera was used when it arrived at the mobile unit site. (Pltf.Br. ¶¶ 12–17.) In addition, Siemens sent NCS an invoice for a "used" nuclear gamma camera system on January 11, 1994, six days before delivery to NCS. (Pltf.Ex. 10.) On January 24, 1994, Siemens faxed two invoices to NCS, noting on the cover page of the fax that the invoices were for charges associated with a "used" system. (Pltf.Ex. 13.) Rose states that neither he nor any responsible employee was aware of the invoices at the time, and he continued to believe that he was receiving a new or nearly new (i.e., "demo") system. (Def.Ex. 2(82–86,95–98,263–68).)

From January 17, 1994 to February 22, 1994, NCS had exclusive possession and control of the used nuclear gamma camera system. On February 22, 1994, NCS shipped the mobile unit, including the used camera system, to CVA in Tennessee. CVA rejected the mobile unit, including the used camera, and CVA retained possession of the camera, claiming a security interest. (PTO Stip. ¶¶ 10–12.)

Assuming that NCS accepted the camera system by failing to reject it during the month in which NCS had exclusive control over it, the question arises whether Mr.

Faivre's knowledge of the used condition of the camera and the receipt of the January 11 and January 24 invoices bar NCS's revocation of its acceptance. N.J.S.A. § 12A:1–201(27) (Supp.1996) is instructive:

> Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to the attention of the individual if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of the individual's regular duties or unless the individual has reason to know of the transaction and that the transaction would be materially affected by the information.

For the purposes of this motion, I infer that Mr. Faivre was not significantly involved in the negotiation of this transaction and that he did not relate his observations about the camera's appearance upon delivery to Mr. Rose. In addition, I infer that he was not aware that the camera was supposed to be new or that the used nature of the camera would materially affect the transaction between NCS and Siemens. Siemens, who has the burden here, fails to show these inferences are unwarranted. Therefore, I cannot impute Mr. Faivre's knowledge to NCS at the time the camera was received.

The effect of the invoices including the word "used" sent by Siemens six days before and shortly after delivery is a closer question. However, NCS presents evidence that Mr. Rose did not see the invoices until much later. Again, the summary judgment burden lies here with Siemens. On the Rule 56 materials before me, I cannot conclude as a matter of law that failure to bring those invoices to Mr. Rose's attention showed a lack of due diligence on the part of NCS. No evidence was presented as to NCS's internal

communications system, its chain of command for this transaction, or the custom in the industry (i.e., whether invoices for orders already under contract are typically regarded as critical and are brought immediately to the attention of the individual in charge of the transaction). Mr. Rose's knowledge and NCS's diligence remain questions of fact for trial.

#### B.

■ I turn next to the question whether NCS adequately notified Siemens of its revocation. Two requirements must be met for adequate notice of revocation. Notice must be timely, and it must be sufficient in content. As to the timing issue, notice must be sent "within a reasonable time after the buyer discovers or should have discovered the ground for [revocation]." N.J.S.A. § 12A:2–608(2) (1962). Therefore, I must first determine the earliest date on which I can conclude as a matter of law that NCS discovered or should have discovered that the camera was used.

As discussed above, I cannot impute Mr. Faivre's knowledge upon delivery to NCS. In addition, I am not able to conclude as a matter of law that Mr. Rose should have known that the camera was used either upon delivery or receipt of the invoices bearing the word "used." Questions of fact remain under N.J.S.A. § 12A:1–201(27) (Supp.1996).

NCS delivered the mobile unit, including the used camera, to CVA on February 25, 1994. On March 1, 1994, CVA sent a letter to NCS stating that CVA was not accepting the mobile unit and reserved its right to reject the unit entirely. The letter stated that CVA had learned through Siemens that the camera was several years old and had been installed previously in Centralia, Washington. (Def.Ex. 17.)

Beginning on March 1, 1994, NCS requested a complete history of the camera in the mobile unit from Siemens. (Def.Ex. 21,22,-23,32,33,35.) NCS did not receive a complete description until March 8, 1994. (Def.Ex. 2(131–32),25.) Notably, on March 4, 1994, NCS wrote Siemens asking to discuss the "difference in the system we obtained in

contrast to the system we had ordered." (Def.Ex. 22.) In a second fax on that date, NCS asked Siemens how fast it could "obtain a replacement system" if CVA's claims about the age of the camera were true. (Def.Ex. 23.) On March 8, 1994, Siemens faxed a letter detailing the history of the camera being sold once before in 1989 and leased to a hospital in Washington. According to NCS, this was the first time that Siemens revealed that the camera had been sold before and that it was much older than NCS originally believed. (Def.Ex. 2 (131–32),25.)

Thus, the earliest date when NCS, under these circumstances, can be charged with knowledge of nonconformity is March 8, 1994, the date Siemens sent the letter detailing the history of the camera. To have any remedy, NCS then had to notify Siemens of the breach within a "reasonable time" of its discovery of the breach (i.e., March 8, 1994). N.J.S.A. § 12A:2–607(3)(a). Further, to have effectively revoked acceptance, NCS must have notified Siemens of its revocation within a "reasonable time" after March 8, 1994. N.J.S.A. § 12A:2–608(2) (1962).

■ Sections 607(3)(a) and 608(2) are not redundant. Section 607(3)(a) requires more timely, but less specific notice than § 608. Official Comment 4 to N.J.S.A. § 607 (1962) and Official Comments 4 & 5 to N.J.S.A. 12A:2–608 (1962) are instructive. They reflect that the drafters contemplated a buyer accepting nonconforming goods and immediately informing the seller of any defect. Such initial notice need not be extensive. Rather, it need only "let the seller know that the transaction is troublesome and must be watched." N.J.S.A. § 12A:2–607 cmt.4 (1962). The buyer should then be given some time to negotiate with the seller for an adjustment before being required to give notice of revocation. N.J.S.A. § 12A:2–608 cmt.4 (1962). However, as to the content of the notice, "[m]ore will generally be necessary than the mere notification of breach required under [§ 607]." N.J.S.A. § 12A:608 cmt.5 (1962). Under either section, however, no particular form of notice is required. Rather, the content of the notice is to be judged under "considerations of good faith,

prevention of surprise, and reasonable adjustment." *Id.*

■ Here, there is no question that NCS met § 607's requirement for quick, minimal notice. The correspondences sent by NCS on March 4, 1994 were sufficient to alert Siemens that the transaction might be "troublesome." The more pertinent question is whether NCS sent timely notice of revocation. Siemens contends that NCS did not send adequate notice at any time before litigation. Under New Jersey law, however, the adequacy of the content and timing of notice of revocation are questions for the jury. *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 125 N.J.Super. 251, 310 A.2d 491, 494 (App.Div.1973).

It would not be unreasonable for a jury to find that NCS gave notice of revocation even before March 8, 1994. On March 4, 1994, NCS inquired as to when it could obtain a replacement system if CVA's claims as to the used nature of the camera system were true. Because Siemens admits it knew all along that the camera was used, it would not be unreasonable to find that NCS's March 4, 1994 fax was sufficient notice of revocation to prevent the type of unfair "surprise" about which the code seems to be concerned. This is a question for the jury. *See also Rowe Int'l, Inc. v. J–B Enterprises, Inc.*, 647 F.2d 830 (8th Cir.1981) (stating that whether the content of notice of breach is sufficient is normally a question of fact for the jury).

■ Importantly, NCS is not barred from seeking rescission through revocation of acceptance simply because it did not immediately return or offer to return the camera to Siemens. It is axiomatic that a buyer cannot unilaterally rescind a contract and keep possession of the consideration; however, where the buyer is unable to return the goods, it does not necessarily operate as a bar to rescission. *American Container Corp. v. Hanley Trucking Corp.*, 111 N.J.Super. 322, 268 A.2d 313, 319 (Ch.Div.1970). In *American Container*, the buyer was unable to return the goods because they were in the possession of the police through no fault of the buyer. The court found that this was not a bar to the remedy of rescission. Similarly, here, NCS was unable to return the camera

immediately to Siemens because it was in CVA's possession. CVA claimed a security interest in the camera pending the resolution of the Tennessee litigation and NCS's performance under the settlement agreement. On November 30, 1995, NCS offered to return the camera to Siemens as soon as CVA released it. (Def.Ex. 57.) As of August 27, 1996, the camera was in NCS's possession. (Pltf.Ex. A.) The record is silent as to whether the camera has since been tendered or returned to Siemens. However, because NCS alleges that Siemens is at least partially at fault for NCS's liability to CVA, it would be inequitable to bar the remedy of rescission at this time.

### C.

■ The next issue is whether NCS is barred from revoking its acceptance because NCS substantially changed the condition of the camera when it installed the camera in the mobile unit and transported it to CVA in Tennessee. N.J.S.A. § 12A:2–608(2). (Pltf.Br. p. 10.) The camera was damaged during shipment, and Siemens presents unchallenged evidence that the estimated cost to repair is $15,000–18,000. (Pltf.Ex.21(44–45).) Under the circumstances revocation is not barred as a matter of law.

■ CVA arranged for insurance coverage on the unit. After being notified of the damage, NCS suggested that CVA contact the insurance company to investigate the damage. (Def.Ex. 13,15.) The record does not reflect whether the camera has since been repaired. The purpose of preventing substantial changes in the condition of the goods before revocation is to protect sellers from substantial injustice. N.J.S.A. § 12A:2–608 cmt. 6. Courts have interpreted this to mean that sellers should not be responsible for defects caused or aggravated by the actions of buyers before revocation. *See Roy Burt Enterprises v. Marsh,* 328 N.C. 262, 400 S.E.2d 425, 427 (1991). Here, however, the damage to the camera had nothing to do with the alleged defect that caused the breach (i.e., the camera being used instead of new). Nothing NCS did made the camera any less new. Nor can NCS be said to have acted in bad faith or for

its own advantage regarding the damage. Assuming insurance coverage, Siemens is not so significantly disadvantaged as to warrant barring NCS from revoking its acceptance as a matter of law.

### D.

Siemens also presents invoices showing that NCS has failed to pay for additional goods and services "unrelated to the issue of whether the camera was to be new or used." (Pltf.Br. p. 15; Pltf.Ex. 25; Complaint ¶¶ 8,19.) NCS presents deposition testimony that it has not paid these invoices either because they relate to charges incidental to the litigation or because NCS did not order the items in question. (Def.Ex. 2(227–30).) NCS has, therefore, presented enough evidence to create a genuine issue of fact as to the NCS's liability for the charges in question.

### E.

■ In its motion, Siemens also seeks a judgment as to attorneys' fees and interest. As I am not awarding any damages to Siemens at this time, I will not address the issue of interest. However, at least to the extent that Siemens argues that it is entitled to attorneys' fees pursuant to its contract with NCS, its motion is denied.

The January Agreement between Siemens and NCS did not contain a provision awarding attorneys' fees to Siemens in the event of litigation. The first time that such a provision appears is in the "Terms and Conditions" printed on the back of an invoice dated September 22, 1992. (Pltf.Ex. 10.) The provision is then included on the back of each invoice for equipment ordered by NCS thereafter. (Pltf.Ex.E.)

■ Contrary to Siemens' argument, the invoices sent after the January Agreement was signed had no effect on the obligations of NCS as to the items ordered under that contract, including the nuclear gamma camera that is the principal subject of dispute in this case. Because the contract between Siemens and NCS was concluded in writing upon Mr. Rose signing the contract, the invoices did not constitute

"confirmations" under N.J.S.A. § 12A:2–207 (1962). Therefore, NCS was under no obligation to object to any disagreeable terms in those invoices. *See Graham Paper Co. v. Schottco Corp.,* 555 F.2d 193 (8th Cir.1977). In addition, for those items that NCS ordered outside of the original contract, it is a question of fact as to whether the addition of an attorneys' fees provision materially alters the contract between the parties under N.J.S.A. § 12A:2–207(2) (1962). *See N & D Fashions, Inc. v. DHJ Industries, Inc.* 548 F.2d 722, 726 (8th Cir.1976); *ICI Australia Ltd. v. Elliott Overseas Co.,* 551 F.Supp. 265 (D.N.J.1982).

In sum, therefore, I will deny Siemens' motion for summary judgment as to its claim for breach of contract because material factual issues remain to be decided.

### IV.

Siemens contends that even if I were to deny its summary judgment motion on its claim for breach of contract, it is entitled to summary judgment on NCS's counterclaim for breach of contract. The January Agreement explicitly relieves Siemens from any liability for "loss of use, revenue or anticipated profits, or for any direct, indirect or consequential damages arising out of or in connection with the sale of (sic) use of the products." (Pltf.Ex. 2(Terms & Cond. ¶ 11.1).) Therefore, Siemens contends that in case of breach of contract, it could only be liable for a return of the purchase money paid by NCS. NCS admits that it never paid the contract price. (Answer ¶ 16.) Thus, Siemens argues that NCS cannot recover on its breach of contract counterclaim as a matter of law. NCS contends that, without consequential damages, its remedies would necessarily fail of their essential purpose. I disagree with both parties.

Parties may agree by contract to limit a buyer's remedies "to return of the goods and repayment of the price." N.J.S.A. § 12A:2–719(1)(a) (1962). In addition, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." N.J.S.A. § 12A:2–719(3) (1962). However, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided [in the rest of the code]." N.J.S.A. § 12A:2–719(2) (1962). The New Jersey Supreme Court has recognized that these provisions reflect the competing policies of "freedom of contract . . . and the insistence upon minimum adequate remedies to redress a breach of contract." *Kearney & Trecker Corp. v. Master Engraving Co.,* 107 N.J. 584, 527 A.2d 429, 434 (1987).

The seller's right to exclude liability for consequential damages is not absolute, however. In order to be effective, the limitation must not "operate to deprive either party of the substantial value of the bargain." *Id.* 527 A.2d at 433 (quoting N.J.S.A. § 12A:2–719 cmt. 1 (1962)). If one party is deprived of the benefits of its bargain, the limited remedies have failed of their essential purpose, and the general remedy provisions of the code apply. *Id.*

*Kearney & Trecker* is instructive. In that case the contract specified that the seller would not be liable for consequential damages. *Id.* 527 A.2d at 431. In addition, the contract stated that the buyer's exclusive remedies would be limited to a warranty to repair or replace the defective part of the product or a return of the purchase price. *Id.* The machine in question did not work properly for much of the first few years, and the seller was not able to adequately repair it. At trial, buyer recovered consequential damages.

The New Jersey Supreme Court, however, held that even if the limited remedy of repair and replacement failed of its essential purpose (i.e., the seller was unable to fix the machine), the clause allocating the risk of consequential damages to the buyer was not automatically voided. *Id.* 527 A.2d at 438. Rather, the court concluded that the other remedies available to the buyer—return of the machine for a refund of the purchase price and damages for the breach of warranty to repair and replace—provided the buyer with a fair quantum of remedy. *Id.* 527 A.2d at 439. Further, the court stated that "[i]t is only when the circumstances of the transaction, including the seller's breach, cause the consequential damage exclusion to be inconsistent with the intent of the parties that

invalidation of the exclusionary clause would be appropriate under the Code." *Id.* 527 A.2d at 438.

Based upon the record at trial, the court concluded as a matter of law that the facts did not justify invalidation of the consequential damage exclusion because the consequential damages incurred by the buyer were well within the reasonable expectations of the parties. *Id.* 527 A.2d at 438–39. Both parties were sophisticated, the product in question was known at the time of contracting to be somewhat experimental, and there was no evidence that the seller did not attempt to repair the machine, only that it may not have been successful. Under these circumstances, the court held that the consequential damages incurred by the buyer were not beyond the commercial expectations of the parties. *Id.*

The facts are similar here; however, the contract is not as restrictive as in *Kearney & Trecker.* NCS agreed not to hold Siemens liable for "any direct, indirect or consequential damages arising out of . . . the sale [or] use" of the camera. The language of a contract is to be construed against the party who prepared it when there is fair doubt as to its meaning. *Herbstman v. Eastman Kodak Co.,* 131 N.J.Super. 439, 330 A.2d 384, 388 (App.Div.1974), *rev'd on other grounds,* 68 N.J. 1, 342 A.2d 181 (1975). I do not read that provision in the January Agreement as excluding recovery for direct damages due to breach of the contract between NCS and Siemens. Rather, it is only concerned with damages arising out of the "sale [or] use" of the camera (such as the liability to CVA that NCS alleges to have incurred). Therefore, NCS may still have the remedy of direct damages for the breach. Presumably, such direct damages would comprise the difference, if any, between the market value of the contracted-for nuclear gamma camera and the value of the camera actually tendered.

I note that NCS's claim for recission may be inconsistent with a claim for direct damages for breach of contract. This may require an election by NCS, but this issue is not ripe for decision.

The contract also provided for a limited warranty against defects in material workmanship. Further, as discussed above, NCS can obtain rescission of the contract by showing that it successfully revoked its acceptance. There is no evidence that any of these remedies, in particular or as a whole, has failed of their essential purpose. Through its available remedies, NCS may yet realize the benefit of its bargain. Consequently, even without a remedy for consequential damages, I am satisfied that NCS was left with a fair quantum of relief as a matter of law.

This does not mean, however, that I have decided to deny recovery for consequential damages. Rather, it remains to be determined at trial whether the exclusion of consequential damages in this case is unconscionable under N.J.S.A. § 12A:2–719(3). More particularly, a genuine question of fact remains whether the exclusion of a remedy for consequential damages is "inconsistent with the intent and reasonable commercial expectations of the parties." *Kearney & Trecker,* 527 A.2d at 438.

I will therefore deny Siemens' motion for summary judgment on NCS's counterclaim for breach of contract. Genuine issues of fact remain to be decided regarding the amount and propriety of direct damages from Siemens' alleged breach and the availability of consequential damages.

## V.

Siemens further contends that NCS's counterclaim for intentional interference with contractual relations is barred by the doctrine of issue preclusion. I agree.

On August 1, 1995, the United States District Court, Eastern District of Tennessee, granted CVA partial summary judgment on its claim for breach of contract against NCS. The court determined that NCS's offer to cure was prompt and appropriate but held that NCS would not have been able to cure "in a timely fashion even if a cure had been agreed upon." (Def.Ex. 52(p.4).) Further, the court stated that there is "no 'right' to cure a nonconforming shipment in situations where the seller may have known all along that a used product had been substituted for

a new one." (*Id.*) On August 15, 1995, CVA moved for entry of final judgment with respect to its breach of contract claim. That motion was denied on September 18, 1995. (Def.Ex. 53.) The court cited judicial economy as its reason for denying CVA's motion; the court did not want any claims to be appealed until the entire suit, including CVA's claims for fraud and misrepresentation, was resolved. (*Id.*) Thereafter, Siemens intervened in the Tennessee action.

The Tennessee litigation between CVA and NCS was then settled and dismissed with prejudice pursuant to stipulation filed June 24, 1996. Siemens and NCS stipulated to the dismissal of their Tennessee case without prejudice.

Siemens argues that because the Tennessee court has already decided that NCS breached its contract with CVA, as a matter of law Siemens could not have interfered with NCS's contractual relations with CVA. I agree.

As I understand its argument, NCS contends that it is not precluded from litigating its counterclaim because the Tennessee judgment was never made final, NCS did not have an opportunity to appeal the partial summary judgment, and the judgment was wrong. I do not find any of these arguments persuasive.

▬▬▬ Mutuality of parties is not necessary to the application of the doctrine of issue preclusion. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979). Rather, so long as the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue, nonmutual use of issue preclusion is permissible. *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1519 (10th Cir. 1990). Federal district courts have broad discretion to determine when nonmutual issue preclusion should be applied. *Parklane*, 439 U.S. at 331, 99 S.Ct. at 651–52. A district court should not apply nonmutual issue preclusion where the party seeking to invoke it could have easily joined the first action or where it would be unfair to the other party. *Id.*

Here, Siemens did join the previous action before it was settled. Further, it would not be unfair to apply nonmutual issue preclusion against NCS. NCS had significant incentive to litigate the breach of contract issue with CVA in Tennessee. Therefore, so long as the other requirements for applying issue preclusion are met, I see no reason why Siemens cannot use it here.

In the Tenth Circuit, issue preclusion requires that

(1) the issue previously decided is identical to the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party ... to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Murdock v. Ute Indian Tribe of Uintah & Ouray Resv.*, 975 F.2d 683, 687 (10th Cir. 1992) (quoting *In Re Lombard*, 739 F.2d 499, 502 (10th Cir.1984)). The issue that NCS is trying to relitigate (whether it breached its contract with CVA) is precisely the same issue that NCS litigated in the Tennessee action. Therefore, the only questions are whether the partial summary judgment entered by the Tennessee court constitutes a final adjudication on the merits and whether NCS had a full and fair opportunity to litigate the issue in the Tennessee case.

▬▬▬ The Tenth Circuit has not squarely addressed whether a partial summary judgment order that was not made final before the parties settled and voluntarily dismissed the case may serve as the basis for issue preclusion in subsequent litigation. I must therefore look to the law of other circuits for guidance. There appears to be no clear consensus among the federal courts on this issue. I am persuaded, however, that issue preclusion should apply in this case.

### A.

Recent decisions in various circuits have relaxed the finality requirement for issue preclusion. *See, e.g., John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 563 (8th Cir.1990), cert. denied, 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991); *Dyndul v.*

*Dyndul,* 620 F.2d 409, 412 (3d Cir.1980) ("Finality for issue preclusion purposes is a more 'pliant' concept than it would be in other contexts.... [Finality] may mean little more than that the litigation of a particular issue has reached such a point that a court sees no really good reason for permitting it to be litigated again."). No longer must a judgment be final in the appealable sense under 28 U.S.C. § 1291 to preclude further litigation of the issue. *Id.; Miller Brewing Co. v. Joseph Schlitz Brewing Co.,* 605 F.2d 990, 996 (7th Cir.1979); *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir.1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); *But see Avondale Shipyards, Inc. v. Insured Lloyd's,* 786 F.2d 1265, 1269 (5th Cir.1986). The operative inquiry now seems to be whether the previous judgment is "sufficiently firm to be accorded conclusive effect." Restatement of Judgments (Second) § 13 (1982); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 4434 (1981); *Morrell,* 913 F.2d at 564. The bounds of that concept, however, are still being drawn.

The Restatement suggests that unless a judgment is avowedly tentative, the preclusive effect of the judgment should be determined by weighing a number of factors, including: (1) whether the parties were fully heard, (2) whether the court supported its decision with a "reasoned opinion," and (3) whether the decision was subject to appeal. Restatement of Judgments (Second) § 13 cmt. g (1982). Most courts agree that a jury verdict on liability constitutes a final judgment even if damages have not yet been determined. *Morrell,* 913 F.2d at 563. However, the finality of an interlocutory order, such as a partial summary judgment, presents more difficult questions. In particular, Fed.R.Civ.P. 54(b) states that any order that is not made final and does not adjudicate all of the claims "is subject to revision at any time before the entry of judgment." Therefore, arguably all orders of partial summary judgment are tentative and should not be given preclusive effect.

The Fifth Circuit has adopted that approach. Unlike many jurisdictions, the Fifth Circuit has maintained that the finality required for issue preclusion is the same as the finality required for claim preclusion. *International Union of Operating Engineers v. Sullivan Transfer, Inc.,* 650 F.2d 669, 676 (5th Cir.1981); *compare Dyndul v. Dyndul,* 620 F.2d 409 (3d Cir.1980) (adopting the Restatement position that finality for issue preclusion is not as strict as for claim preclusion). In *Avondale Shipyards, Inc. v. Insured Lloyd's,* the Fifth Circuit stated flatly that "an order granting partial summary judgment 'has no res judicata or collateral estoppel effect.' " 786 F.2d 1265, 1272 (1986) (quoting *Golman v. Tesoro Drilling Corp.,* 700 F.2d 249, 253 (5th Cir.1983)); *accord St. Paul Fire & Marine Ins. v. F.H.,* 55 F.3d 1420, 1425 (9th Cir.) (adopting a more relaxed definition of finality than the Fifth Circuit, but refusing to give partial summary judgment preclusive effect), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995). The court reasoned that if it allowed partial summary judgment orders to have preclusive effect,

> the result is either that nearly every interlocutory ruling will be issue preclusive, or that it will be almost impossible to determine in advance which will be preclusive and which not. The former alternative renders the availability of appellate review virtually irrelevant; the latter undermines predictability and efficiency.

786 F.2d at 1271.

The court also reasoned that allowing interlocutory orders to have preclusive effect would be inconsistent with another requirement of issue preclusion in the Fifth Circuit—that the issue must have been essential to the prior judgment. *Id.* at 1271. The "essential issue" requirement is based on a lack of confidence in decisions that were not essential and on the unavailability of appellate review. *Id.* The Fifth Circuit found that it would be inconsistent with that premise to allow preclusive effect for a partial summary judgment order "as to which not only is appeal presently unavailable but it is also impossible to know whether appeal will ever be available and whether any issue thus ruled on will be essential to the judgment in the case." *Id.*

I am not persuaded by the Fifth Circuit's reasoning, at least as it applies here. Although Rule 54(b) provides that an order that is not explicitly made final is subject to later revision, it would be pedantic to contend that all interlocutory orders are therefore "tentative" in any real sense. It presupposes that a party will move for reconsideration of the order and that the court would grant it. Significantly, where, as here, a party has settled and dismissed the case with prejudice, Fed.R.Civ.P. 54(b) no longer applies, and whatever orders have been entered into the case are frozen, not subject to reconsideration.

In addition, the Fifth Circuit has recently recognized an inconsistency in its own decisions. Jury verdicts, like partial summary judgment orders, are subject to revision under Fed.R.Civ.P. 54(b) until they are entered as final. The Fifth Circuit, however, gives preclusive effect to such nonfinal jury verdicts. *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1295 (5th Cir.1995). The court has recognized this incongruity but has not yet addressed it. *Marine Shale Processors, Inc. v. United States Environmental Protection Agency,* 81 F.3d 1371, 1380 n. 2 (5th Cir.1996).

Further, the Fifth Circuit's rationale ignores other policy concerns. If a partial summary judgment is never to have preclusive effect, a party involved in a series of suits against different litigants will have the option to avoid preclusive effects in future suits simply by settling the current suit whenever an unfavorable summary judgment order is issued. This would be directly contrary to the goal of judicial economy that collateral estoppel is designed to promote. *Parklane,* 439 U.S. at 326, 99 S.Ct. at 649. So long as it would not be inequitable to do so, it makes inimitable sense to preserve and use whatever firm judicial decisions have been made previously on a particular issue. To accomplish that, however, the power to determine the preclusive effect of judgments must not be left in the hands of parties who are interested in avoiding such effects.

Although no other circuit courts have addressed the precise issue whether a partial summary judgment order can support issue preclusion, several courts have implied that they take a less formalistic approach to the finality requirement than the Fifth Circuit. *Dyndul v. Dyndul,* 620 F.2d 409, 412 (3d Cir.1980) (advocating a "pragmatic approach with reference to judicial policy rather than to finality in a technical sense"); *In re Brown,* 951 F.2d 564, 568–70 (3d Cir.1991) (holding that state court summary judgment order should be given preclusive effect even though it was not yet appealable because state court showed no intention of reversing its decision and demonstrated knowledge of the applicable facts and law); *Morrell & Co. v. Local Union 304A,* 913 F.2d 544, 563–64 (1990) (holding that determination only of liability issues is sufficiently final to support issue preclusion although the damages trial remained); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins.,* 722 F.Supp. 998, 1008–11 (S.D.N.Y.1989) (stating that ordinarily partial summary judgment would have preclusive effect but not where previous judgment was vacated), *aff'd in part, rev'd in part on other grounds,* 970 F.2d 1138 (2d Cir.1992); *Sherman v. Jacobson,* 247 F.Supp. 261 (S.D.N.Y.1965) ("A judgment may be final despite the fact that an appeal from it has not been decided, whether the appeal is pending, or the party has lost its right to appeal because of the circumstances of the case.") (citing *United States v. Munsingwear, Inc.,* 340 U.S. 36, 38, 71 S.Ct. 104, 105–06, 95 L.Ed. 36 (1950) (stating that a judgment does not lose its finality simply because the party lost its opportunity to appeal when the case became moot)). In addition, at least one other district court has decided specifically that a partial summary judgment not made final due to settlement does have preclusive effect. *Ossman v. Diana Corp.,* 825 F.Supp. 870 (D.Minn.1993). I agree that the technical requirements of finality must yield to the policies sought to be advanced by issue preclusion.

Here, the Tennessee court's order granting CVA's motion for partial summary judgment on its breach of contract claim against NCS expressed no reservations as to its finality. (Def.Ex. 52.) Although the judge later denied CVA's request to make the order final, it was not because of any substan-

tive concerns the judge had about the propriety of his decision. (Def.Ex. 53.) Rather, he stated that the request to make the order final was being denied for reasons of judicial economy. (Def.Ex. 53.) At no time did the judge indicate that he was reconsidering his ruling on CVA's motion for partial summary judgment. Nor has NCS pointed to any facts that the Tennessee judge was unaware of when he granted the motion for partial summary judgment.

In addition, although NCS lost its opportunity to appeal the Tennessee ruling, it could have preserved the right to appeal in that case. Rather than allowing the summary judgment on the breach of contract claim to become final in a Rule 58 sense, however, NCS chose to settle the entire action and, thus, relinquished its opportunity for appeal. This is a very different situation than the Fifth Circuit seems to have been concerned about in *Avondale Shipyards*. Here, NCS had every reason to believe that the Tennessee court's order would be appealable once it became final. The partial summary judgment decided liability on an entire claim; thus, it was essential to the judgment and appealable. Therefore, by allowing partial summary judgment to have preclusive effect here, I am not opening the floodgates to preclusive effect of all interlocutory orders. Even the Fifth Circuit has recently recognized that if a partial summary judgment is partial "in name only," it can be given preclusive effect. *Royal Ins. Co. v. Quinn–L Capital Corp.*, 960 F.2d 1286, 1295 n. 11 (5th Cir.1992) (applying preclusion where the district court had entered final judgment based in part on its earlier ruling for partial summary judgment but had neglected to make the partial summary judgment itself final).

 I am also not creating confusion as to which orders will have preclusive effect upon settlement of the case. Where, as here, the court has entered a partial summary judgment against a party on an entire claim and the losing party chooses to settle rather than secure an appeal, that party will face subsequent application of the doctrine of issue preclusion. In the future it may be wise to limit issue preclusion based on partial summary judgment to situations where sub-

sequent litigation is foreseeable at the time of the first action. I do not need to decide that today, however, as the present case was clearly foreseeable to NCS when the Tennessee action was concluded.

**B.**

NCS also argues that its settlement and stipulated dismissal of the Tennessee action should negate any preclusive effects of previous rulings in that case. I assume that NCS contends that the application of issue preclusion here offends two prongs of the issue preclusion test: the finality of judgment requirement and the provision ensuring full and fair opportunity to litigate. I disagree on both counts.

 Several courts have decided that settlement does not avoid the application of issue preclusion where the issue has been fully litigated. *See, e.g., Bates v. Union Oil*, 944 F.2d 647, 650 (9th Cir.1991), *cert. denied*, 503 U.S. 1005, 112 S.Ct. 1761, 118 L.Ed.2d 424 (1992); *Hartley v. Mentor Corp.*, 869 F.2d 1469, 1472 (Fed.Cir.1989) (stating that the "voluntary relinquishment [by settlement] of one's right to appeal, where one stands as the overall loser," allows for the preclusive use of issues that have not been appealed). I agree. NCS's tactical choice to settle all of the claims involved in its suit with CVA instead of appealing the negative summary judgment entered against it has no bearing on the preclusive effect of the Tennessee judge's order.

As discussed in the preceding section, the order was sufficiently final, despite the settlement before final judgment was entered. In addition, whatever disadvantage NCS incurred with regard to its opportunity to litigate was self-imposed by voluntary settlement. Therefore, I fail to see how the settlement and dismissal of the action has any independent effect on the question of issue preclusion.

 The Supreme Court has come to a similar conclusion regarding vacatur. Ordinarily, when a case on appeal becomes moot through no fault of the party who lost below, that party has the right to have the lower court vacate its judgment. *United States v.*

*Munsingwear Inc.,* 340 U.S. 36, 40, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950). The Court has stated that a "party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). The Court has specifically refused, however, to extend the *Munsingwear* doctrine to situations where the losing party voluntarily settled the case on appeal. *Id.* at ——, 115 S.Ct. at 391.

The Court stated that a party who settles rather than completing an appeal "has voluntarily forfeited his legal remedy by the ordinary processes of appeal ..., thereby surrendering his claim to the equitable remedy of vacatur. The judgment is not unreviewable, but simply unreviewed by his own choice." *Id.* at ——, 115 S.Ct. at 392. Accordingly, the Court examined the equitable considerations involved in allowing vacatur after settlement. Foremost in the concerns of the Court was the public interest, which the Court concluded would be best served by preserving judicial precedent where a party voluntarily relinquishes the right to appeal through prescribed channels. *Id.; see also Oklahoma Radio Assoc. v. Federal Deposit Insurance Corp.,* 3 F.3d 1436, 1444 (10th Cir.1993) (recognizing before *Bancorp* the problems with allowing parties to contract around the existence of negative precedent through settlement and vacatur).

■ Issue preclusion, like vacatur, is an equitable doctrine. *See Parklane,* 439 U.S. at 331, 99 S.Ct. at 651–52. Thus, I must consider the public interest in applying issue preclusion here. As discussed, where it is not unfair to the parties, the public interest is best served by preserving sufficiently firm judgments. Here, NCS had fair notice that the issue of its breach of its contract with CVA would be critical in this case. Further, NCS should have known that the partial summary judgment entered against it would have been appealable once it became final. Instead, NCS voluntarily relinquished its right to appeal that ruling by settling the case. The public interest would not be served by allowing parties to avoid the preclusive effect of adverse judgments so expediently.

Arguably, my decision may discourage settlement in some cases. To the extent this is true, however, preventing settlement may actually conserve judicial resources. The only parties that will be discouraged from settling will be those who fear future, related liability based on negative partial summary judgment orders. If such parties are encouraged by issue preclusion not to settle the first action and to appeal instead, litigants and the court in a subsequent action will be saved the time and expense to relitigate and second guess an already-decided issue. In addition, it may not result in additional appeals because the subsequent action is just as likely to be appealed as the first.

The Court in *U.S. Bancorp* was similarly concerned with the effect of its decision on settlements. 513 U.S. at ——, 115 S.Ct. at 393. The Court admitted, however, that it was not in a position to assess the impact of its holding "upon the frequency or systemic value of settlement." *Id.* I profess no more prescience than the Court in this respect; however, I am convinced that my ruling here will not dramatically affect settlement in most cases.

### C.

Finally, I find ineffectual NCS's contention that the Tennessee judge's decision to grant the partial summary judgment motion was incorrect. *See Goss v. Goss,* 722 F.2d 599, 605 (10th Cir.1983) ("[T]he res judicata or collateral estoppel consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong.'" (quoting *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981)); *Disabled Am. Veterans v. Commissioner,* 942 F.2d 309, 316 (6th Cir.1991) ("It requires more than mere belief that a case was wrongly decided to avoid the application of the collateral estoppel doctrine."). The Tennessee court's opinion showed an appreciation for the applicable facts and law. I am not convinced based on the record before me that the court's ruling was patently wrong. In addition, the appropriate means to chal-

lenge that court's reasoning was by appeal, an action NCS chose not to take.

This case is distinguishable from *Knox v. Lederle Laboratories,* 4 F.3d 875 (10th Cir. 1993). There, the Tenth Circuit interpreted Colorado law to deny preclusive effect to a partial summary judgment in a previous state court suit. Plaintiffs had originally filed suit in Colorado state court. One of the defendants, Wyeth Laboratories, moved for summary judgment based solely on an affidavit by a third party. The court granted Wyeth's motion for partial summary judgment. Wyeth then ceased to participate in the case. Although Wyeth had an opportunity to do so, it never moved for final entry of the judgment. Plaintiffs subsequently dismissed their case without prejudice in state court but failed to give notice to Wyeth. Plaintiffs then brought an action in the United States District Court, District of Colorado against all of the original defendants, including Wyeth.

In the interim, the affidavit that had been the sole basis for Wyeth's state summary judgment motion had been recanted. Wyeth moved for summary judgment in the federal action based on the preclusive effect of the state court's partial summary judgment order. The district court denied the motion but granted Wyeth leave to file an interlocutory appeal.

The Tenth Circuit held that Wyeth could not invoke claim preclusion. *Id.* at 880. According to Restatement (Second) of Judgments § 13, which Colorado adopted, claim preclusion requires a final judgment as opposed to issue preclusion, which only requires a "sufficiently firm" judgment. *Id.* Therefore, Wyeth was prevented from invoking claim preclusion.

In addition, the court stated that even if Wyeth had tried to invoke issue preclusion, it would not have succeeded. *Id.* The court reasoned that the dismissal of the action *without* prejudice operated to vacate all previous orders in the case. *Id.* Further, even if Wyeth succeeded in collaterally attacking the dismissal for lack of notice, at best it could reopen the state action. *Id.* Because the affidavit Wyeth relied upon had been recanted, the Tenth Circuit reasoned that the

partial summary judgment was not sufficiently firm to be afforded preclusive effect. Rather, the state court clearly would have reversed its summary judgment order under Colo.Civ.Proc.Rule 54(b) upon the recanting of the affidavit. *Id.*

*Knox* is not controlling in this case. First, in *Knox,* the Tenth Circuit was interpreting Colorado law as opposed to federal law. Second, unlike Wyeth, Siemens was not in a position to move for entry of final summary judgment. Third, unlike in *Knox* the action between NCS and CVA was dismissed *with* prejudice. Fourth, the court in *Knox* was primarily concerned with claim preclusion as opposed to issue preclusion because the parties and the claims were the same in the two cases. As discussed, the finality of judgment requirement is more strictly enforced for claim preclusion than issue preclusion. Finally, the court in *Knox* was dealing with a partial summary judgment that was predicated on false evidence. The state court would have denied Wyeth's summary judgment motion had it known that the affidavit on which it relied would be recanted. In contrast, NCS has presented no evidence that was not before the court in the Tennessee action, and there is no indication in the record that the judge there would have reversed his order for partial summary judgment.

*Knox* does contain language warning against the creation of "new" rules of preclusion. The Tenth Circuit stated that "[i]nvoking preclusion based on new, unforseeable doctrines ... is deeply unfair" and could result in increased litigation. *Id.* at 881. The court made that statement, however, in the context of Wyeth's request to allow preclusion to lie even if the previous judgment was not final or sufficiently firm for issue preclusion. *Id.* at 880.

The issue preclusion that I invoke today is neither new nor unforeseeable. Rather, I am addressing an issue of first impression in this circuit: whether under federal law issue preclusion may be based on an order for partial summary judgment in appropriate circumstances. When the Tennessee action was concluded, it was apparent that this is an issue about which there has been considera-

ble disagreement among the federal courts. Therefore, NCS should find it neither surprising nor unfair that I am applying issue preclusion here.

#### D.

The elements of a claim for intentional interference with contractual relations are as follows: there must be a contract; the wrongdoer must have knowledge of the contract; the wrongdoer must have intended to induce a breach of the contract; the wrongdoer must have acted maliciously; the contract must have been breached; the act complained of must have been the proximate cause of the breach; and damages must have resulted from the breach. *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169 (Tenn. App.1987); *Edwards v. Travelers Ins.,* 563 F.2d 105 (6th Cir.1977). If NCS breached its contract with CVA, Siemens cannot be liable for inducing CVA to breach its contract with NCS.

I am satisfied that the issue of NCS's breach of its contract with CVA has reached a point where no really good reason exists for its relitigation. I conclude that the Tennessee court's order granting partial summary judgment was sufficiently final to preclude further litigation as to whether NCS breached its contract with CVA. I further conclude that NCS had a full and fair opportunity to litigate the issue. It is therefore impossible for Siemens to have interfered with NCS's contractual relations with CVA. Consequently, I will grant Siemens' motion for summary judgment on NCS's counterclaim for intentional interference with contractual relations.

Accordingly, it is ORDERED that:

1. Siemens' motion for summary judgment is DENIED as it relates to Siemens' breach of contract claim and NCS's breach of contract counterclaim;

2. Siemens' motion for summary judgment is GRANTED as it relates to NCS's counterclaim for intentional interference with contractual relations.